UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE OCEAN RIG UDW INC., ET AL.

17-cv-7222 (JGK)

MEMORANDUM OPINION
AND ORDER

**JOHN G. KOELTL, District Judge:**

This case is about the recognition under Chapter 15 of the Bankruptcy Code, 11 U.S.C. § 1501 et seq., of the Cayman Islands-based reorganization of Ocean Rig UDW Inc. ("UDW"), a Cayman Islands exempted company, and three of its subsidiaries (together with UDW, the "appellees," or the "debtors").[1] Tally M. Wiener (the "appellant"), an attorney proceeding pro se, filed an appeal of the bankruptcy court's August 24, 2017 Memorandum Opinion recognizing the debtors' Cayman Islands restructurings as foreign main proceedings, In re Ocean Rig UDW Inc., 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (the "Recognition Order"), and the accompanying order of the same date granting related relief, In re Ocean Rig UDW Inc., 17-10736-mg (Dkt. No. 130) (the "Enforcement Order"). The debtors now move to dismiss the

---

[1] UDW's three subsidiaries are Drill Rigs Holdings Inc. ("DRH"), Drillships Financing Holding Inc. ("DFH"), and Drillships Ocean Ventures Inc ("DOV"). Each of the subsidiaries is registered as a non-resident corporation in the Republic of the Marshal Islands ("RMI") and as foreign companies under § 186 of the Cayman Companies Law.

1

appeal. For the reasons explained below, the debtors' motion to dismiss is granted.

I.

On appeal, the Court reviews a bankruptcy court's factual findings for clear error and its legal conclusions de novo, Nat'l Union Fire Ins. Co. v. Bonnanzio, 91 F.3d 296, 300 (2d Cir. 1996); In re Lyondell Chemical Co., et al., No. 17-cv-4375(DLC), 2018 WL 565272, at *5 (S.D.N.Y. Jan. 24, 2018). The Court may affirm on any ground that finds support in the record and need not limit its review to the bases raised or relied upon in the decisions below. See, e.g., Borrero v. Connecticut Student Loan Found., No. 97-cv-1382, 1997 WL 695515, at *1 (D.Conn. Oct. 21, 1997); In re Coronet Capital Co., No. 94-cv-1187, 1995 WL 429494, at *3 (S.D.N.Y. July 20, 1995); see also Freeman v. Journal Register Co., 452 B.R. 367, 369 (S.D.N.Y. 2010).

II.

The debtors are each holding companies that own, through a large group of non-debtor companies, a fleet of deepwater oil drilling rigs, which are leased to exploration oil and gas companies. Recognition Order at 689. Together, they operate as an international offshore oil drilling contractor, owner, and operator of drilling rigs and provide drilling services for offshore oil and gas exploration, development, and production.

2

Id. at 693. The debtors specialize in the ultra-deepwater and harsh-environment segments of the offshore drilling industry. Id.

The joint provisional liquidators and authorized foreign representatives (the "JPLs") of the debtors petitioned the bankruptcy court for recognition of the Cayman Provisional Liquidation Proceedings and subsequent applications for the sanctioning of schemes of arrangement in respect of foreign debtors under section 86 of Part IV of the Companies Law (the "Cayman Schemes," together with the Cayman Provisional Liquidation Proceedings, the "Cayman Proceedings") as a foreign main proceeding and for certain related relief under Chapter 15 of the Bankruptcy Code. Id. at 690-91.

The appellant filed an objection to the JPL's recognition request on July 10, 2017, asserting that the appellant was a shareholder of UDW. Id. at 691; In re Ocean Rig UDW Inc., 17-10736-mg, Dkt. 89. On August 24, 2017, after a trial where the appellant was allowed to present evidence and cross-examine witnesses, the bankruptcy court granted the JPLs' petitions. Recognition Order at 691, 707; Enforcement Order at 6. Although the bankruptcy court observed that the appellant "offered no evidence" supporting her contention that she in fact owned shares in UDW, and had therefore "failed to establish that she is a party-in-interest with standing to contest recognition" of

3

the Cayman Proceedings, the bankruptcy court nonetheless treated the appellant's objection as if she had standing and reached the merits of her objection. Recognition Order at 691-92.

The debtors employ their drilling rigs to drill wells for customers on a "day rate" basis, charging a fixed price per day of rig operation dependent upon the level of efficiency with which the rig is operating. Id. at 693-94. As of the date of the Recognition Order, the debtors were dependent for revenues on five drilling rigs, operating offshore near Norway, Brazil, and Angola. Id. at 694. One of the rigs was under a long-term contract, expiring in September 2020; two of the rigs were under contracts set to expire in 2017; and two of the rigs were under contracts set to expire during the first half of 2018. Id. Rigs not under use must be deactivated, at a cost of $5 million each, and either "warm stacked" at a cost of approximately $40,000 per day, or "cold stacked" at a cost of approximately $5,000 per day. Id.

Each of UDW's subsidiaries had incurred substantial debt, which UDW had guaranteed and secured with UDW's shares of each respective subsidiary. Id. at 692. As of the date of the Recognition Order, DRH had approximately $460 million in outstanding debt, DFH had approximately $1.83 billion in outstanding debt, and DOV had approximately $1.27 billion in outstanding debt. Id. at 692-93. Additionally, at the time of

4

the Recognition Order, UDW had approximately $131 million in outstanding unsecured notes. Id. at 693.

An oil and gas drilling industry down-cycle -- with crude oil prices falling from $100 per barrel to $52 per barrel between March 2014 and March 2017 -- together with the debtors' outstanding debt obligations, their expiring contracts, and the high costs of deactivating and stacking drilling rigs, combined to place the debtors under financial pressure. Id. at 694. As of the date of the Recognition Order, the debtors were experiencing declining "day rates" and expected continued reduction in customer demand until at least 2019. Id.

As of the debtors' initiation of the Cayman Proceedings, UDW was insolvent and had an upcoming interest payment that it did not have the money to pay without borrowing funds, which UDW would not have been able to repay. Antonios Kandylidis Decl. ("Kandylidis Decl.") ¶ 15, In re Ocean Rig UDW Inc., 17-10736-mg, Dkt. 5. UDW also would not have had sufficient assets to pay off its debt at maturity later in 2017, which would have triggered cross-default provisions in the debtors' credit agreements, accelerating approximately $3.7 billion in debt. Id. ¶ 16; see Recognition Order at 694.

However, the Republic of the Marshall Islands ("RMI"), where the debtors previously maintained their center of main interests ("COMI"), does not have a statute or any procedures

5

permitting reorganization. Recognition Order at 694. The debtors therefore sought to move their COMI to the Cayman Islands, which does have statutory law and procedures permitting restructuring. Id. The bankruptcy court found that none of the debtors have ever maintained administrative, management, or executive offices in the RMI, have ever had any directors who were residents or citizens of the RMI, or have ever held a meeting of its directors or shareholders in the RMI. Id. at 696. In contrast, the bankruptcy court determined that, in light of the fact that several directors of the debtors had residences in the Cayman Islands, the debtors held regular board meetings in the Cayman Islands, several significant officers of UDW resided and worked in the Cayman Islands, office and administrative services for the debtors were performed from the Cayman Islands, the share certificates of UDW's subsidiaries securing the various debt obligations were held in the Cayman Islands, the debtors all had bank accounts used for the debtors' business in the Cayman Islands, and the debtors' books and records were held in the Cayman Islands, that the debtors' COMI was the Cayman Islands. Id. at 696-98, 702. The bankruptcy court further determined that the debtors had not manipulated their COMI in bad faith and that the requirements of sections 109(a) and 1517(a) of the Bankruptcy Code, necessary for a bankruptcy court to confirm a

6

foreign proceeding under Chapter 15, were met. Id. at 699-700, 706-707.

The bankruptcy court therefore granted the JPLs' petition for recognition of the Cayman Proceedings under Chapter 15 of the Bankruptcy Code and ordered related relief, including an automatic stay of all proceedings against the debtors in the United States. See 11 U.S.C. § 1520(a).

Although the appellant did not seek a stay of the Enforcement Order, on September 7, 2017, the appellant filed a notice of appeal of both the Recognition Order and the Enforcement Order. Among the appellant's contentions are that venue was not proper in the Southern District of New York, that the debtors' COMI was not in the Cayman Islands, that the debtors improperly attempted to change their COMI, and that recognition of the Cayman Proceedings violates the public policy of the United States. In re Ocean Rig UDW Inc., 17-10736-mg (Dkt. No. 89). The debtors' reorganization became final on September 22, 2017. See U.S. Securities and Exchange Commission Form 6-K – Report of Foreign Private Issuer Pursuant to Rule 13A-16 or 15D-16 of the Securities Exchange Act of 1934 for UDW (Exhibit B to the debtors' motion to dismiss).

### III.

The debtors now move to dismiss the appeal on two grounds. First, that the appellant lacks standing to appeal the

bankruptcy court's orders because she is not an "aggrieved person" with a pecuniary interest in the debtors' reorganization, but rather is asserting the rights of third parties. Second, that, in any event, the appeal is equitably moot because the debtors' reorganization has already been substantially implemented.

A.

To have standing to appeal a bankruptcy court order, an appellant must be an "aggrieved person." Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 388 (2d Cir. 1997). "[A] party to the bankruptcy proceedings is permitted to appeal a particular order only if the order directly affects his pecuniary interests." Kane v. Johns-Manville Corp. (In re Johns-Manville, Corp.), 843 F.2d 636, 642 (2d Cir. 1988). In a bankruptcy context, "if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order." Id.

In addition to satisfying the aggrieved person standard, an appellant must also have prudential standing. This requires that the appellant assert the appellant's own legal rights and interests and not those of third parties. In re Quigley Co., 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008) ("[T]he objecting party can only challenge the parts of the plan that directly implicate its

8

own rights and interests."). Prudential standing is particularly important in a bankruptcy context where one party may seek to challenge the plan based on the rights of third parties who favor the plan. In re Johns-Manville, 843 F.2d at 644. "In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights." Id.; see also Freeman v. Journal Register Co., 452 B.R. 367, 371 (S.D.N.Y. 2010).

As a purported shareholder in UDW, the appellant is not an "aggrieved person" and therefore lacks standing to pursue this appeal. As of the initiation of the Cayman Proceedings, UDW was insolvent and had an upcoming interest payment that it did not have the money to pay, and the appellant does not contest the debtors' insolvency prior to the Cayman Proceedings. UDW also would not have had sufficient assets to pay off its debt at maturity later in 2017, which would have triggered cross-default provisions in the debtors' credit agreements, accelerating approximately $3.7 billion in debt. Moreover, under the Cayman Scheme, UDW's debt was to be exchanged for new equity representing the value of UDW immediately prior to the restructuring of the other debtors. Kandylidis Decl. ¶ 19. That is, the total value of UDW, represented by the new equity, would go to UDW's creditors pro rata, with no value left for its

pre-restructuring shareholders. The appellant, as a purported shareholder, did not stand to lose anything from, and thus had no pecuniary interest in, UDW's restructuring. While the Cayman Scheme called for a small portion of new equity -- 0.02% -- to go to pre-reorganization shareholders, it did so not because those shareholders were entitled to those newly issued shares (i.e., not because the debtors' creditors had all been paid in full), but rather in an effort to avoid having to re-register UDW's shares on the NASDAQ, which would have "adversely affected" the newly issued shares. See Appellant's Mem. Law Opp'n to Appellees' Mot. Dismiss Ex. C at 2-3.

The appellant also contends that because UDW's pre-restructuring shareholders were to receive 0.02% of the UDW's newly issued equity under the Cayman Scheme, that she had a pecuniary interest in UDW's restructuring. However, the fact that UDW's creditors chose to provide its pre-restructuring shareholders with this nominal amount of new equity in an effort to avoid having to re-register its stock on NASDAQ, thereby providing increased liquidity for the creditors' own shares of UDW, does not change the fact that the appellant was not entitled to receive anything as part of the debtors' restructuring because the debtors' creditors had not received the full portion of their claims. While unsecured creditors may have standing to challenge such "gifts" to shareholders when

10

their own recovery is adversely affected, none of the creditors in this case opposed this plan, and the appellant does not point to any authority for the proposition that such "gifts" provide the recipient shareholders with standing to contest the restructuring. See In re DBSD N. Am., Inc., 634 F.3d 79, 95 (2d Cir. 2011) ("Absent the consent of all impaired classes of unsecured claimants, therefore, a confirmable plan must ensure either (i) that the dissenting class receives the full value of its claim, or (ii) that no classes junior to that class receive any property under the plan on account of their junior claims or interests.").

Rather than contesting the debtors' insolvency, the appellant contends that under the decision of the Second Circuit Court of Appeals' in In re Fairfield Sentry Ltd., 714 F.3d 127 (2d Cir. 2013), shareholders of an insolvent entity have standing to contest recognition of the entity's reorganization under Chapter 15. However, In re Fairfield Sentry is distinguishable. In that case, a shareholder of Fairfield Sentry Limited, a feeder fund that invested with Bernard L. Madoff Investment Securities LLC, appealed the district court's judgment affirming the bankruptcy court's order recognizing the liquidation of Fairfield Sentry Limited, the feeder fund, in the British Virgin Islands under Chapter 15. The shareholder's standing was not contested, and the shareholder's appeal was

decided on the merits. However, there was no indication that the case involved any creditors of the feeder fund -- or that any existed -- other than its shareholders, who therefore would have had a claim to any proceeds of the liquidation. In fact, the Court of Appeals explained that, as of the date of the petition for recognition of the foreign liquidation, the feeder fund had tens of millions of dollars in liquid assets and billions in claims and causes of actions. In re Fairfield Sentry Ltd., 714 F.3d at 131. The Court of Appeals did not reference any liabilities. In re Fairfield, therefore, does not stand for the proposition that a shareholder of an insolvent foreign company has standing to appeal the recognition of the company's foreign reorganization when the company's creditors will not recover in full.

The appellees' motion to dismiss the appeal because the appellant lacks standing is therefore **granted**.

### B.

The appellant's appeal must be dismissed for the additional reason that it is equitably moot because the debtors' reorganization pursuant to the Cayman Proceedings has already taken place, and the appellant did not seek a stay of the bankruptcy court's Recognition Order.

"An appeal [of a reorganization under Chapter 11 of the Bankruptcy Code] should . . . be dismissed as moot when, even

12

though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325 (2d Cir. 1993) ("Chateaugay I"). "Equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005). Courts have imported the policy from its origin in Chapter 11 to cases under Chapters 7, 9, and 13 of the Bankruptcy Code. See Stokes v. Gardner, 483 F. App'x 345 (9th Cir. 2012) (Chapter 7); In re City of Detroit, 838 F.3d 792, 800-01 (6th Cir. 2016) (Chapter 9); Bace v. Babitt, No. 07-cv-2420 (WHP), 2008 WL 800579 (S.D.N.Y. Mar. 25, 2008) (Chapter 13). And the Court of Appeals for the Second Circuit has dismissed on mootness grounds an appeal from an injunction that enforced, pursuant to 11 U.S.C. § 304 (the predecessor of Chapter 15), provisions of a foreign arrangement winding up foreign companies. Allstate Ins. Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994).

In the context of a reorganization under Chapter 11, when a reorganization has been substantially consummated,[2] there is a "strong presumption" that an appeal of an unstayed order is moot. Allstate, 174 B.R. at 889; see also In re Metromedia Fiber Network, Inc., 416 F.3d at 144; A & K Endowment, Inc. v. Gen. Growth Props., Inc. (In re General Growth Props., Inc.), 09-cv-5508, 2010 WL 532504, at *6 (S.D.N.Y. Feb. 16, 2010); Compania Internacional Financiera S.A. v. Calpine Corp. (In re Calpine Corp.), 390 B.R. 508, 516 (S.D.N.Y. 2008). This presumption may only be overcome when five circumstances are present:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the

---

[2] In the context of Chapter 11, the Bankruptcy Code defines "substantial consummation" as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).

> failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay, Corp.), 10 F.3d 944, 952-53 (2d Cir. 1993) ("Chateaugay II") (internal citations, quotations, and alterations omitted).

Courts in this Circuit have emphasized the importance of an appellant seeking a stay in the context of Chapter 11 proceedings. Loral Stockholders Protective Comm. v. Loral Space & Commc'ns Ltd. (In re Loral Space & Commc'ns Ltd.), 342 B.R. 132, 141 (Bankr. S.D.N.Y. 2006) ("[S]eeking a stay is of the utmost importance to an appellant desiring to preserve an appeal of a confirmation order."). "The failure to seek a stay of the confirmation order pending appeal, with the result that the reorganization is substantially consummated, in particular lends itself to a finding that an appeal is moot." In re Calpine Corp., 390 B.R. at 517. "In the absence of any request for a stay, the question is not solely whether we can provide relief without unraveling the Plan, but also whether we should provide such relief in light of fairness concerns." In re Metromedia Fiber Network, Inc., 416 F.3d at 145 (citing Chateaugay I and II) (emphasis omitted); see also Journal Register Co., 452 B.R. at 372-73. The Second Circuit Court of Appeals has explained that, while seeking a stay is not explicitly required in order to pursue an appeal, "[t]he party who appeals without seeking to

avail himself of that protection does so at his own risk." Chateaugay I, 988 F.2d at 326.

In this case, the appellant did not seek a stay of the bankruptcy court's recognition of the Cayman Proceedings. The appellees argue persuasively that, since the finalization of the Cayman restructuring on September 22, 2017, the debtors' positions have comprehensively changed, and the Cayman reorganization has been substantially completed, because the debtors have issued new equity and made cash distributions to creditors and entered into a new secured debt facility, as well as a long-term management services agreement. There is thus a strong presumption that the appellant's appeal is moot because the debtors' reorganization has already been substantially completed.

The appellant argues that the cases dealing with reorganizations under Chapter 11 of the Bankruptcy Code and recognition under former Bankruptcy Code section 304 have no force in the context of Chapter 15, which replaced former section 304. However, the appellant cites no authority for this proposition, and it is unpersuasive. The inequity of unwinding a reorganization that has been substantially completed, and which the appellant failed to seek to stay, applies equally in the context of foreign reorganizations as it does to domestic ones. See Chateaugay I, 988 F.2d at 325 (noting that in the bankruptcy

16

context "the ability to achieve finality is essential to the fashioning of effective remedies."). Moreover, the principles of comity that underlay the recognitions of foreign reorganizations under former Bankruptcy Code section 304 apply just as forcefully in the context of recognitions of foreign proceedings under Chapter 15. As the Fifth Circuit Court of Appeals explained, "[c]entral to Chapter 15 is comity." Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV), 701 F.3d 1031, 1043 & n.13 (5th Cir. 2012) (noting that "[w]hile § 304 has been replaced by Chapter 15, caselaw applying that section remains relevant to evaluating requests for relief"); Allstate, 174 B.R. at 890 (citing "concerns of comity" when explaining the court's reluctance to modify an injunction enforcing certain provisions of a foreign reorganization). Congress explicitly instructed that "[i]n interpreting [Chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. Refusing to recognize foreign bankruptcy proceedings that have been substantially consummated plainly would not promote the application of similar statutes in foreign jurisdictions, nor would it promote international cooperation and legal certainty, enumerated objectives of Chapter 15. 11 U.S.C. § 1501(a).

Just as in domestic reorganizations, the principles of finality and fairness weigh heavily in favor of dismissing as moot the appeal of a substantially consummated reorganization where the appellant failed to seek a stay of the reorganization. And just as under former Bankruptcy Code section 304, concerns of comity and the interest in promoting the application of statutes in foreign jurisdictions that are similar to United States bankruptcy proceedings weigh heavily in favor of recognizing reorganization schemes enacted by foreign authorities. Because the appellant has failed to show why these same concerns do not apply in this case, the appellees' motion to dismiss this appeal as equitably moot is **granted**.

### IV.

The appellant has moved to strike the appellees' reply brief in support of their motion to dismiss. The gist of the appellant's argument is that, unless the district court orders otherwise, under Federal Rule of Bankruptcy Procedure 8013(f)(3)(B) a reply brief must not exceed ten pages, see Fed. R. Bankr. P. 8013(f)(3)(B), and that the appellees' reply brief, "which is 15 pages long, exceeds the 10-page limit . . . ." Appellant's Letter Mot. Seeking Strike Appellees' Reply Brief (Dkt. No. 26) at 2.

The appellant's letter motion lacks merit and is denied. The appellees' reply brief is ten pages long. See Appellees'

18

Reply Mem. Law Supp. Mot. Dismiss. (Dkt. No. 24). The appellant's argument is based on the contention that because Rule 8013 does not specifically exempt the cover page, table of contents, table of authorities, and the signature block from the ten-page limit, that the Rule' ten-page limit is inclusive of this non-substantive content. The appellant does not posit any rationale for why non-substantive portions of a brief should count toward a page limit. Under the appellant's reading of Rule 8013, in fact, no cover page, table of contents, or table of authorities is required, and litigants would therefore have an incentive to exclude such non-substantive -- but useful -- content in order to save space for argument. Such an outcome is not required by the Rule. In any event, the Court would grant any necessary motion to include these non-substantive items <u>nunc pro tunc</u> pursuant to Rule 8013(f)(3).

## CONCLUSION

For the reasons stated above, the appellees' motion to dismiss the appeal is **granted**. The Clerk is directed to close Docket No.18, dismiss the appeal, and close this case.

**SO ORDERED.**

**Dated:** New York, New York
April 5, 2018

_____
John G. Koeltl
United States District Judge